**TRANS–PACIFIC FREIGHT CONFERENCE OF JAPAN et al.,
Petitioners,**

**v.**

**FEDERAL MARITIME COMMISSION
and United States of America,
Respondents.**

**No. 17975.**

United States Court of Appeals
Ninth Circuit.

March 6, 1963.

Graham, James & Rolph, Chalmers G. Graham, Alexander D. Calhoun, Jr., San Francisco, Cal., and G. Merle Bergman, Long Beach, Cal., for petitioners.

James L. Pimper, Gen. Counsel, Robert E. Mitchell, Deputy Gen. Counsel, and Thomas D. Wilcox, Atty., Federal Maritime Commission, Washington, D. C., Lee Loevinger, Asst. Atty. Gen., and I. Daniel Stewart, Atty., Dept. of Justice, Washington, D. C., for respondents.

Walkup & Downing, and Bruce Walkup, San Francisco, Cal., Galland, Kharasch, Calkins & Lippman, George F. Galland, and Amy Scupi, Washington, D. C., for interveners States Marine Lines, Inc., and Global Bulk Transportation Corp.

Before POPE, HAMLIN and MERRILL, Circuit Judges.

POPE, Circuit Judge.

This is a petition seeking review of an order of the Federal Maritime Commission which required the petitioners to cancel certain fines assessed against States Marine Lines, Inc., a member of the petitioning conference. The petition is addressed to this court pursuant to the provisions of the Act of December 29, 1950, 64 Stat. 1129, 5 U.S.C. § 1032. The petitioners are the conference above named and some of the individual ship-

ping companies, common carriers by water, who are members of that conference.

On March 12, 1959, and thereafter, the conference agreement (filed with the Federal Maritime Board pursuant to § 15 of the Shipping Act, 1916, hereafter referred to) contained a provision whereby a so-called "Neutral Body," appointed by the conference, was authorized to receive complaints respecting alleged violations of provisions of the agreement by members of the conference, to determine whether such infringement had taken place, and to levy fines for offenses, the fines ranging from a maximum of $10,000 for the first offense to a maximum of $30,000 for a fourth offense.

The Neutral Body successively assessed two fines against States Marine, one for $10,000, the other for $15,000, for two separate refusals to make its business records available for examination as required by the conference agreement. Following each imposition of fine, States Marine filed a complaint with the Federal Maritime Board pursuant to § 22 of the Shipping Act, 46 U.S.C. § 821, attacking the appointment of the so-called Neutral Body and the imposition of the fines, alleging that the conference and its Neutral Body had acted illegally and in violation of § 15 of the Shipping Act, 1916, and praying for cease and desist orders directed to the conference declaring that the imposition of the fines was in violation of the conference agreement and of the Shipping Act, 1916, as amended.

After the second complaint had been filed the proceedings relating to the two complaints were consolidated and hearing was had before an examiner which led in turn to the issuance of the order here

sought to be reviewed. Pending the proceedings the Federal Maritime Board was succeeded by the respondent Federal Maritime Commission.[1]

Trans-Pacific Freight Conference of Japan is a rate fixing association whose organic agreement to join together was approved by the Commission, or its predecessor board or commission, in 1930. By it the members combine for the purpose of fixing traffic rates and trade practices. Among the conference practices prohibited was the granting or receiving of special rates or special privileges including the granting of rebates.

Early in the year 1958 two members of the conference threatened to resign because of alleged breaches of conference obligations by other members. The members then agreed that additional provisions needed to be added to the agreement so as to provide for a better policing of alleged violations. A conference meeting held in March, 1958, provided in its minutes for the establishment of an independent self-policing agency for the conference. When this conference action came to the attention of the Federal Maritime Board it notified the conference that it considered the agreement to constitute a modification of the conference agreement of such character as to require that it be filed pursuant to § 15 of the Shipping Act. Thereupon the agreement was redrafted in the form of amendments to the conference agreement and it was filed with the Federal Maritime Board and approved by it on March 12, 1959. The principal provisions of this amendment of the conference agreement are contained in Article 25, copy of which is set forth in the margin.[2]

1. This was pursuant to Reorganization Plan of 1961 effective August 12, 1961, 26 Fed.Reg. 7315, 75 Stat. 840.

2. "25. Neutral Body. There shall be a Neutral Body selected and appointed by the conference from responsible accountants or other person or persons, not a party to, nor employed by or financially interested in any party to the agreement upon such terms as are agreed between the conference and the Neutral Body. The

Neutral Body shall have the following powers, duties and responsibilities.
1. To receive complaints in writing from members of the conference pursuant to their obligations hereunder to report malpractices.
2. To investigate said complaints and receive evidence thereon from members of the conference or from the conference offices or otherwise.
3. To engage agents, lawyers or other experts in connection with its investi-

The meeting of March, 1958, was approximately a year prior to the approval of the amendments above mentioned by the Federal Maritime Board. About that time a firm of accountants known as Lowe, Bingham & Thomsons, of Tokyo, Japan, was appointed as Neutral Body pursuant to the agreement entered in the minutes of the conference. In January 1959, also prior to the approval of the amendments mentioned, the Neutral Body, here referred to as Lowe, received a complaint from a member of the conference that States Marine had engaged in rebating, or other similar malpractices, in connection with the movement of mandarin oranges from Japan to Canada during the 1958 season. An employee of Lowe visited the Tokyo offices of States Marine and was permitted to inspect their records relating to this movement.

The inspection turned out to be inconclusive. Thereafter, and on April 28, 1959, after the amendments had been approved by the Board, Price Waterhouse & Co., a firm of certified public accountants at New York City, was requested as agent for Lowe to obtain access to the New York City records of States Marine and examine them insofar as they related to the carriage of mandarin oranges from Japan to Canada during the 1958 season.[3]

States Marine rejected the requested access to its New York records on the ground that the Neutral Body, Lowe, was "employed by" United States Lines Co., a member of the conference, in that Lowe acted as the Japan correspondent of Price Waterhouse in auditing the books of United States Lines, and that Lowe, as "employee" of a member line was ineligible to serve as Neutral Body.

gation and consideration of complaint and to pay on behalf of the conference all costs incidental to engagement and use of such agents, lawyers and other experts.

4. To have absolute discretion to decide whether or not an infringement has taken place and the conference shall have no right to question such decision, subject to the maximum fines set forth below. The maximum fines assessed by the Neutral Body shall be:

   (a) First offense up to a maximum of U.S. $10,000.00
   (b) Second offense up to a maximum of U.S. $15,000.00
   (c) Third offense up to a maximum of U.S. $20,000.00
   (d) Fourth offense and subsequent offenses up to a maximum of U.S. $30,000.00

5. To report to the extent appropriate the result of its investigation to the Ethics Committee but without disclosing the names of complainants. The Ethics Committee shall notify the member lines through the conference Chairman.

6. To give directions as to payment of fines after assessment and notification to the Ethics Committee.

7. The undersigned lines promise to report immediately to the Neutral Body directly any apparent or alleged deviation from the conference agreement of its rules and regulations of correct and ethical practices thereunder which come to their attention or knowledge. All

lines agree to accept the decision(s) and any assessment(s) of fines thereof by the Neutral Body as final and binding.

8. To enable complaints to be investigated, the conference shall make available to the Neutral Body all records, correspondence and documents of every kind wherever located and give all assistance and information whatsoever verbal or otherwise which may be required by the Neutral Body at their absolute discretion. All the records of the freight conference at the secretary's office will also be available to the Neutral Body.

9. The conference members jointly and severally shall indemnify the Neutral Body against any liability to third parties including employees under any libel or other action which might be brought against the Neutral Body arising from the performances of its duties under this agreement. The conference members jointly and severally shall have no right to claim against the Neutral Body or their agents in any such libel or other action.

10. The retainer fee and other compensation for services of the Neutral Body shall be as agreed between the member lines and the Neutral Body."

3. It is noted that the approved amendment (footnote 2, supra) authorized the Neutral Body to engage "agents, lawyers and other experts in connection with its investigation and consideration of complaints."

It is to be noted that Article 25 relating to the Neutral Body, (see footnote 2, supra) provides that it shall be appointed from person or persons "not a party to, nor employed by or financially interested in any party to the agreement."

Another reason assigned by States Marine for its refusal of access to its records was that the Price Waterhouse firm could not serve as an agent of the Neutral Body since it was the auditor for United States Lines. Its selection as an agent to make this inspection was asserted to be a violation of the conference agreement.[3a]

Thereafter the Neutral Body, that is to say, Lowe, assessed the $10,000 fine against States Marine for refusing to make its business records available as required by the conference agreement.[4] States Marine then filed its first complaint with the Federal Maritime Board.

In February, 1961, the Neutral Body received another complaint directed against States Marine charging rebating in connection with the transportation of mandarin oranges from Japan to Canada during the 1960 season. Following this, the Neutral Body sought to inspect records of States Marine at its Tokyo office. This inspection was rejected and the Neutral Body then assessed its second fine against States Marine for $15,000. This was followed by the second complaint by States Marine.

Thereafter the proceedings under both complaints were consolidated for hearing as we have previously indicated. Hearings were held before an examiner who issued an initial decision which was reviewed by the Federal Maritime Commission, which had replaced the Federal Maritime Board during the pendency of the hearings. The Commission's final report and order,

of which review is sought in the present proceedings, was issued on April 16, 1962.

In its report the Commission found that both the Neutral Body, Lowe, and its agent, Price Waterhouse, were "employed by" United States Lines, a member of the conference, within the meaning of the prohibition against such employment of a Neutral Body contained in the conference agreement; and that both the Lowe firm and the Price Waterhouse firm were ineligible to serve in their respective capacities. It found that the conference's use of Lowe as the Neutral Body was a violation of the approved agreement because Lowe was in a member's employment. It found that since the Neutral Body did not conform to the requirements of the conference agreement, the fines levied against States Marine were unlawful and unenforceable; and that in appointing Lowe as Neutral Body, and in the imposition of fines, the conference had violated § 15 of the Shipping Act. The order cancelling the fines and to cease and desist from attempting to collect them followed.

■■ The first and apparently principal contention of the petitioner herein is that the Commission lacked authority and jurisdiction to make any finding with respect to the capacity of the Lowe firm to act as a Neutral Body or as to the validity of the fines imposed since the investigation by the Neutral Body out of which those fines accrued was carried on pursuant to a complaint dealing with alleged improper practices in the carriage of mandarin oranges from Japan to Canada. The contention is that this was transportation from one foreign country to another; that it had nothing to do with foreign commerce between the United States and a foreign country; and

3a. With respect to this second ground of refusal relating to the alleged disqualification of Price Waterhouse, it appears that the conference on August 19, 1959, adopted a formal resolution interpreting the conference agreement as meaning that the prohibition against employment by a party to the conference agreement did not apply to agents employed by the Neutral

Body and hence that the selection of Price Waterhouse was proper.

4. It should be noted that paragraph 8 of Article 25, (see footnote 2, supra) provides that to enable complaints to be investigated the conference should make available to the Neutral Body "all records, correspondence and documents of every kind wherever located."

that hence the Commission had no jurisdiction or authority to deal with the acts and transactions which grew out of the complaint relating to foreign commerce.[5]

We think the Commission properly rejected this argument. In the first place, the fines in question were not imposed for any act or thing done in connection with the shipments from Japan to Canada. It is true that complaints with respect to those shipments triggered the investigation by the Neutral Body but the fines were imposed solely for a refusal on the part of States Marine to make available its records to the Neutral Body and to permit inspection thereof.

The complaint about the alleged rebating in the mandarin orange trade states that the pay-off or rebate came in the form of free passage from San Francisco to Japan which of course would relate directly to United States commerce. Petitioners themselves seem to recognize this for they state in their brief: "Obviously the information sought is 'more general' than that disclosed by the records pertaining to the movement of mandarin oranges from Japan to Canada."

But we think that petitioners' assertion of lack of jurisdiction is without validity for a more fundamental reason. When the members of the conference chose to adopt their conference agreement and its various amendments, they deliberately elected to enter into a single unitary agreement "to promote commerce from Japan, Korea and Okinawa to Hawaii and Pacific coast ports of the United States *and Canada.*" (Emphasis ours.) Because this was an agreement between common carriers by water in foreign commerce, as defined in the Shipping Act, § 15 of that Act, as it existed at the time here in question and prior to the amendments of October 3, 1961, required that the plaintiff file it with the Board. The same section provided that the Board "may by order disapprove, cancel, or modify" such agreement or "any modification thereof" that it finds to be "unjustly discriminatory or unfair as between carriers, shippers * * * or to operate to the detriment of the commerce of the United States."

The complaints on which the Board and the Commission were asked to act challenged Lowe's qualifications to act as the Neutral Body under the amended agreement. It seems plain that it cannot be argued that the Commission was without authority to make any inquiry in that matter merely because the investigation which led to the fines started with a complaint about a Japan to Canada shipment, for the Neutral Body, under the amended agreement, is one charged with dealing with all sorts of violations of the agreement.[6]

---

5. Petitioners point to the first paragraph of § 1 of the Shipping Act, 1916, as amended, 46 U.S.C. § 801, containing the following definition: "The term 'common carrier by water in foreign commerce' means a common carrier, except ferryboats running on regular routes, engaged in the transportation by water of passengers or property between the United States or any of its Districts, Territories, or possessions and a foreign country, whether in the import or export trade: Provided, That a cargo boat commonly called an ocean tramp shall not be deemed such 'common carrier by water in foreign commerce.'"

6. The Commission said with respect to this present contention of petitioners: "As a matter of their own convenience, they established one conference covering the entire Pacific Coast of the United States and Canada. Their conference agreement does not differentiate between traffic to Canadian ports and United States ports. The Neutral Body was set up to function in exactly the same manner in both trades. United States foreign commerce not only was involved, it predominates in the trade. The conference agreement and its amendments therefore require the Board's approval and continuing supervision under the Act. One obvious answer to respondents' objections, and a course we may have to follow if arguments of this sort are made in the future, would be the elimination of the Canadian trade from agreements presented to us. This would mean that respondents would have to establish a separate conference for the Canadian aspects of their operations, assuming they wanted to operate in concert in that trade. It was an alternative that they could have initially

As we have previously indicated, the Board under § 15 had general authority to disapprove, cancel or modify any agreement or modification thereof, whether or not previously approved by it, that it finds "to operate to the detriment of the commerce of the United States." The Commission had approved, as we have indicated, the amendment incorporated in Article 25 (footnote 2, supra) which plainly enough provides that the Neutral Body must be truly neutral and not include any one employed by or financially interested in any member of the Conference. Whether a further amendment eliminating this requirement of true neutrality would have ultimately been approved by the Board is something on which we are not required to speculate. But it is worth noting that when the Lowe firm undertook to impose fines aggregating $25,000 upon States Marine, they were obviously doing something which the Board could find was operating to the detriment of the commerce of the United States. States Marine was operating in that commerce and a few rep-

etitions of this fining process could easily put it in the hands of a receiver.[7]

The petitioner asserts that the Commission erred in its understanding of the law and acted in an arbitrary and capricious manner in holding that Lowe was "employed by" United States Lines and hence disqualified from acting as a Neutral Body. The argument takes two forms. In the first place it is said that the words "employed by" merely refer to the situation of an ordinary employee, that is to say, one who works for wages or salary in the service of an employer. In the next place it is said that the Commission erred in paying attention solely to the text of this provision in Article 25 without regarding the circumstances which existed at the time that the text was approved. It is said that since Lowe was already selected as Neutral Body when the text of this Article 25 was presented to the Board, the text should be construed as having a meaning consistent with the continued employment of the Lowe firm.

chosen. Having rejected that alternative, we do not think that they may now persuasively or validly contend that we must treat the conference agreement as if it were really two agreements; one applicable to Canadian commerce and the other applicable to United States commerce. The conference agreement itself fails to make such distinction. Nor will we."

7. We think that this attempted argument of the petitioner proves too much. If we were to assume that the conference agreement must be treated as though it were two agreements, one dealing with shipments between Japan and the United States, and the other dealing with shipments between Japan and Canada, and if we were to assume that the second of these two agreements was outside of the Commission's authority, nevertheless we would be required to look at the terms of the agreement itself. They include a provision in Article 14, subdivision b, that no rule or regulation which constitutes a modification, addition or supplement to this agreement (of May 1, 1930) "shall be made effective until it has been approved pursuant to § 15 of the Shipping Act, 1916, as amended."

This shows that the agreement contemplated that it in its entirety should become effective only when approved by the appropriate board; and that stipulated condition precedent obviously applied to the entire memorandum of agreement whether considered to have but one part or two parts. Article 34 of the original agreement also provided that it was "subject to approval by the Governmental agency charged with the administration of § 15." As we shall note hereafter, the vice in this whole matter was the attempted utilization of a neutral body which did not measure up to the required neutrality. No amended agreement which would authorize the Lowe firm to act as a neutral body had ever been drawn. Hence, even assuming that the conference agreement should be treated as two agreements dealing with two kinds of commerce, it would have to be concluded that the Lowe firm had no authority to impose any fine against States Marine because no agreement to grant it such power had ever been drawn or submitted to the Board or Commission.

We are not impressed with petitioners' argument in either respect. As to whether the words "employed by" referred solely to persons having an employee relationship, we think it is within the competence of the Commission in passing on a complaint filed under § 22 of the Shipping Act, to construe the words "employed by" in the light of the record which was before the Commission.

The Commission was an administrative body set up for the purpose of dealing administratively with the problems presented from time to time under the Shipping Act. Its function in this respect was not unlike similar functions performed by the National Labor Relations Board, the Federal Communications Commission, and other commissions created by act of Congress. It has long been recognized that such an administrative body has a broad discretion in effectuating the policies of the Act creating the Commission to determine whether certain statutory requirements apply to certain individuals or groups. In making those decisions such administrative bodies are not limited by common law concepts. The question always is whether the determination of the board or commission has " 'warrant in the record' and a reasonable basis in law." National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170; Rochester Tel. Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147; Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301.

While the Commission here was not dealing with the construction or meaning of statutory language, it was dealing with the meaning of language used in an agreement which the Board itself had approved. We think that the principle of the cases last cited would extend to the present situation, and that the Board's determination that the Lowe firm was "employed by" United States Lines had warrant in the record and a reasonable basis in law. Unless it be recognized that the Commission had this discretion and power of determination, it could not be said to have adequate power to effectuate the policies of the Shipping Act.

It is argued that the Commission was in error in finding that the conference had violated § 15 of the Shipping Act. We cannot agree. At the time here in question § 15 contained the following paragraph: "All agreements, modifications, or cancellations made after the organization of the Board shall be lawful only when and as long as approved by the Board, and before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation."

It is obvious that if the Lowe firm were to continue to act as the Neutral Body it would be necessary to amend the portion of Article 25 above referred to so as to eliminate therefrom the language which requires that the Neutral Body not be a person "employed by" a party to the agreement. This was never done; yet the conference went ahead with the utilization of the Lowe firm as a Neutral Body just as though such an amendment had been made and approved by the Board.

The portion of § 15 last above quoted makes it plain that without such approval it shall be unlawful to carry out, directly or indirectly, any such agreement, modification or cancellation.[8] In attempting to carry out an arrangement for a Neutral Body which was never approved by the Board, the conference was plainly in violation of § 15. § 22 of the Shipping Act provides that, "Any person may file with the Federal Maritime Board a sworn complaint setting forth any vio-

---

8. Of course, the conference never put into writing any amendment of the kind mentioned. It did not say: "The Neutral Body is not disqualified by being employed by a conference member". But it is no less a violation of the act to car- ry into effect an agreement which is merely implied from conduct, or an understanding not reduced to writing, than it would be to carry out a written amendment which lacks Board approval.

lation of this chapter by a common carrier by water, or any other person subject to this chapter * * *." The section provides for investigation by the Board, and that the Board may "make such order as it deems proper". The action was clearly within the statutory authority of the Commission.

Further arguments are made to the effect that the Commission abused its discretion and that the Commission should have approved the action of the conference in its interpretation of the meaning of the language of Article 25 so as to treat the Price Waterhouse firm as a qualified agent of the Neutral Body. We find no basis for either contention.

Accordingly, we hold the order of the respondent Commission to be valid and the same is affirmed.