**AMERICAN ASSOCIATION OF CRUISE PASSENGERS, INC., Appellee,**

v.

**CARNIVAL CRUISE LINES, INC., et al., Appellants.**

**No. 88–7229.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 16, 1989.

Decided Aug. 24, 1990.

J. Michael Cavanaugh, with whom David C. Nolan, Stuart S. Dye, and Mary Boney Denison for Kloster Cruise Ltd., Mark E. Warren and Phillip H. Rudolph, for The Peninsular and Oriental Steam Navigation Co., et al., David L. Roll and Virginia L. White–Mahaffey for Carnival Cruise Lines, Inc., Burton A. Schwalb for Marriott Corp. d/b/a Sun Line Cruises, Sanford M. Litvack, Royal Caribbean Cruise Line, Inc., Edward Schmeltzer for CLIA, Michael Joseph for Ocean Cruise Lines, Inc., and Edward P. Henneberry for Holland America Line–Westours, Inc., were on the brief for appellants. Paul M. Honigberg for Cruise Lines Intern. Ass'n also entered an appearance, for appellants.

Paul C. Warnke, with whom John G. Calendar and Harold E. Kohn were on the brief, for appellee.

R. Frederic Fisher and Lawrence N. Minch for Transpacific Westbound Rate Agreement, Jeffrey F. Lawrence for The Asia North America Eastbound Rate Agreement and Howard A. Levy, for Gulf–European Freight Ass'n, et al., were on the brief, for Amici Curiae Transpacific Westbound Rate Agreement, et al.

Robert D. Bourgoin, Gen. Counsel, and John C. Cunningham, Atty., Federal Maritime Com'n, were on the brief for Amicus Curiae Federal Maritime Com'n, urging reversal. Robert J. Wiggers, Atty., Dept. of Justice, also entered an appearance, for FMC.

Before MIKVA, SILBERMAN, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

The American Association of Cruise Passengers (AACP), which is a travel agency, brought an antitrust action against several vacation cruise lines and two trade associations, alleging an unlawful boycott agreement among them. The district court denied the defendants' motion to dismiss, which was based upon their assertions that a cruise line is a "common carrier" within the meaning of § 3(6) of the Shipping Act of 1984, 46 U.S.C.App. § 1702(6), and that an agreement to which cruise lines are parties is therefore subject to the exclusive

jurisdiction of the Federal Maritime Commission.

We hold that, except to the extent that a cruise calls only at foreign ports, a cruise line is a common carrier under the Shipping Act; to the extent that it is a common carrier, the FMC has exclusive jurisdiction to adjudicate this dispute. With respect to a cruise that calls only at foreign ports, however, the district court has jurisdiction under the Clayton Act. Hence, we affirm in part, and reverse in part.

## I. BACKGROUND

The AACP sued various vacation cruise lines, the Cruise Lines International Association, and the American Association of Travel Agents (hereinafter collectively "defendants" or "carriers"), alleging that they engaged in a concerted refusal to deal with the AACP, in violation of federal and state antitrust laws. In its complaint, the AACP defines "vacation cruises" to "include but not be limited to any travel by a person as a passenger on a cruise ship for vacation purposes." It seeks treble and punitive damages, as well as injunctive relief, under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, under the Maryland Antitrust Act, Commercial Law, § 11-204, and on the common law claim that the defendants' conduct constituted a tortious interference with its business relationships.

The carriers filed motions to dismiss on the ground that the district court lacks jurisdiction over the federal anti-trust aspect of this dispute (and hence over the state law claims pendent thereto). Section 7(c)(2) of the Shipping Act provides: "No person may recover damages ... or obtain injunctive relief under [the Clayton Act] for conduct prohibited by [the Shipping Act]." 46 U.S.C.App. § 1706(c)(2). The carriers asserted that the Shipping Act prohibits a boycott of the type that the AACP alleges—they pointed specifically to § 10(c)(1) of the Shipping Act, which prohibits "two or more common carriers" from engaging in a "boycott or tak[ing] any other concerted action resulting in an unreasonable refusal to deal," *id.* § 1709(c)(1)—and that the anti-

trust claim is therefore subject to the exclusive jurisdiction of the FMC. The AACP opposed the motion to dismiss, arguing that a cruise line is not a "common carrier" within the meaning of § 3(6) of the Shipping Act, and is therefore not subject to the prohibition of boycotts therein.

The district court denied the carriers' motion to dismiss, holding that a cruise line is not a common carrier under the Act. The court stayed the proceedings, however, pending our review of *Petchem, Inc. v. Canaveral Port Authority,* 23 Ship.Reg. Rep. (P & F) 974, 983–85 (1986), in which the FMC had held that a ship sailing from and to Europe, which let passengers disembark temporarily at Port Canaveral, Florida for a visit to Disney World, and a ship offering voyages from Port Canaveral to the Bahamas, are common carriers. The Commission based this decision upon several factors: a cruise comes within the common meaning of "transportation," *i.e.,* the conveyance of cargo or passengers; the Act "plainly include[s] carriers of passengers"; the Congress did not distinguish between one-way and round-trip passenger service, nor exclude trips solely for pleasure; and, because there is no longer a significant amount of one-way passenger service at sea, excluding vacation cruises from the coverage of the Act "would amount to an abandonment of [the FMC's] responsibilities" thereunder. *Id.* at 984–85. As it turned out, however, we did not, in *Petchem,* reach the issue of whether a cruise line is a common carrier. *Petchem, Inc. v. FMC,* 853 F.2d 958, 961 (C.A.D.C. 1988).

Following our non-decision in *Petchem,* the district court returned to this case and granted defendant Cunard Lines' motion to dismiss. Based upon its finding that "Cunard is primarily in the business of providing transportation, in contrast to round-trip cruises," the court decided that it is a common carrier under the Act. The court thus held that the FMC has exclusive jurisdiction over the claims against Cunard.

The district court also reaffirmed its decision that, because the other defendants are not common carriers under the Act, the

court has jurisdiction over the claims against them. At the same time, the court certified the remaining defendants' application for interlocutory appeal of this issue, pursuant to 28 U.S.C. § 1292.

The carriers argue that the plain language and the legislative history of the Shipping Act, and the FMC's consistent interpretation of the Act (and of its predecessor, the Shipping Act of 1916), all lead to the conclusion that a cruise line is a common carrier. They also assert that when the Congress passed the 1916 and the 1984 Acts, it adopted the common law, under which a cruise line was held to be a common carrier. Lastly, the carriers contend that the approach taken by the district court, in which a cruise line is a common carrier if it is "primarily involved in point-to-point," as opposed to round-trip, transportation, creates just the kind of jurisdictional dichotomy that the Congress sought to avoid when it passed the Shipping Act.

The Commission, as amicus curiae, supports the carriers' claim that cruise lines are common carriers, and contends that its decision to that effect in *Petchem* is entitled to deference under *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

## II. ANALYSIS

■ Without deciding how much, if any, deference we owe to the Commission's interpretation of the term "common carrier," we hold that a cruise ship is a common carrier under the Shipping Act if it travels between a U.S. and a foreign port.

### A. *Standard of Review*

Our decision addresses only issues of law. Therefore, we do not defer to the views of the district court. *See, e.g., Molerio v. FBI*, 749 F.2d 815, 820 (D.C.Cir. 1984).

That a cruise line is a common carrier under the Shipping Act is a jurisdiction-enlarging position, to which the *Chevron* rule of deference to the agency's statutory interpretation may or may not apply. *See, e.g., Business Roundtable v. SEC*, 905 F.2d 406, 408 (D.C.Cir.1990) (collecting cases that discuss whether an agency's interpretation of statute "delimiting its jurisdiction" is entitled to deference). We need not decide how much deference to accord the FMC's decision in *Petchem*, however, because after an independent examination of the issue before us, we arrive at essentially the same conclusion as does the Commission.

### B. *U.S.–Foreign Cruises*

Section 3(6) defines "common carrier" to mean:

a person holding itself out to the general public to provide transportation by water of passengers or cargo between the United States and a foreign country for compensation that—

(A) assumes responsibility for the transportation from the port or point of receipt to the port or point of destination, and

(B) utilizes, for all or part of that transportation, a vessel operating on the high seas or the Great Lakes between a port in the United States and a port in a foreign country. . . .

### 1. Textual Arguments

Although § 3(6) does not expressly mention cruise lines, the natural reading of that provision leads to the conclusion, contra the district court, that a U.S.-foreign cruise ship is a common carrier regardless of whether it is engaged in one-way or round-trip transportation.

*First.* A cruise line clearly "hold[s] itself out to the general public to provide transportation by water." Nothing on the face of the Shipping Act suggests that the Congress equated "transportation" with "point-to-point" conveyance, and thereby excluded cruises. Moreover, the reference to "passengers" in the definition of common carriage strongly suggests that the Congress did not intend so to limit the meaning of "transportation." As the Commission noted in *Petchem*, by 1984 virtually all passenger service that could come within § 3(6) consisted of cruises. (Ferries are expressly excluded, and there was by then

almost no point-to-point passenger service left in ocean transportation.) Thus, if cruises are not common carriers, then there are no common carriers of passengers of which to speak. Yet speak of them the Congress did. Rather than imply that the Congress addressed an empty set, we infer that it had cruise ships in mind when it regulated common carrier passenger service. *Cf. National Ass'n of Recycling Industries, Inc. v. ICC*, 660 F.2d 795, 799 (D.C.Cir.1981) ("effect must be given, if possible, to every word ... of a statute ... so that no part will be inoperative or superfluous, void or insignificant" (citations omitted)).

*Second.* The AACP also contends that a cruise ship does not fall within the scope of § 3(6) because it does not "assume[ ] responsibility for the transportation" of its passengers. The AACP points out that a typical cruise contract contains a "port-skipping" provision, which it says allows a cruise ship, "at its own discretion and with no further responsibility to the passenger, [to] omit any scheduled and advertised port of call."

We are unwilling to attribute so much significance to this contractual disclaimer. First, we note that courts have read into this type of contract term an implicit promise by the carrier not to deviate arbitrarily from the cruise ship's published schedule. *See, e.g., Amoco Transp. Co. v. S/S Mason Lykes*, 768 F.2d 659, 662–63 (5th Cir.1985). Especially with this gloss upon the contract, we think that a cruise line may assume responsibility for its passengers' transportation without being bound to a specific itinerary.

In the carriage of goods or passengers point-to-point, the carrier may not discharge its responsibility for transportation if it contracts to take one, or the car one is shipping, to Jamaica, where one's business appointment or empty garage is waiting, but then substitutes Antigua as its port of call. Not so with a cruise. The purpose of taking a cruise, after all, is to enjoy a relaxing holiday aboard ship, generally while still visiting an unfamiliar place ashore. The cruise ship assumes responsi-

bility for that transportation, and can substantially discharge its responsibility even if circumstances require it to skip, or to substitute, a port of call. Getting there, in other words, is more than half the fun.

*Finally.* The AACP asserts that the requirement in § 3(6) that a common carrier assume responsibility "from the port or point of receipt to the port or point of destination" excludes cruise ships from its scope because the "port of receipt" cannot mean the same place as the "port of destination." That is an improbably restrictive interpretation of the statutory terms, however. The Congress undoubtedly meant only that the carrier must assume responsibility from the place at which it picks up passengers to the place at which it had agreed to discharge them; there is no reason to think that it was concerned with whether the two points were one and the same or different.

### 2. Legislative History

Having concluded that a cruise line comes within the terms of § 3(6), we turn to the legislative history of that section, but only in order to ensure that our straightforward reading is not "demonstrably at odds with the intentions of [the] drafters" of the Act. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). That it is not.

The AACP's principal arguments from the legislative history are that the Congress's purposes in enacting the Shipping Act were unrelated to the regulation of cruise lines, and that the subject of cruise lines never arose during the legislative deliberations. Although we are not convinced that the Congress's goals are inapplicable to cruise lines, we can agree that when the Congress enacted the Shipping Act in 1984, it focused almost entirely upon the carriage of goods, rather than of passengers. This observation is far from dispositive, however, for two reasons.

*First.* As we have already discussed, the Congress retained in the definition of common carrier the 1916 Act reference to passengers; thus, despite the focus upon

cargo in the legislative history of the 1984 Act, the Congress quite clearly did not intend to narrow the Commission's jurisdiction to the transportation of goods. Even if the Congress's motivation for passing a new Shipping Act in 1984 related exclusively to the transportation of goods, that would have no bearing upon whether a cruise line was a common carrier under the 1916 Act and, therefore, whether it remained so under the 1984 Act.

*Second.* Although the 1916 Congress almost surely had point-to-point, rather than cruise, passenger transportation uppermost in mind, since that was the predominant type of passenger ship service at the time, cruise lines were not then unknown; there is no reason now to exclude cruise lines from the statutory coverage of passenger service merely because point-to-point service having fallen off, cruise lines are now the predominant part of the industry. As Justice Scalia stated in *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 325, 108 S.Ct. 1811, 1835, 100 L.Ed.2d 313 (1988) (concurring in part):

> [E]ven those who would support the power of a court to disregard the plain application of a statute when changed circumstances cause its effects to exceed the original legislative purpose would concede, I must believe, that such a power should be exercised only when (1) it is clear that the alleged changed circumstances were unknown to, and unenvisioned by, the enacting legislature, and (2) it is clear that they cause the challenged application of the statute to exceed its original purpose.

In this instance, the AACP has made neither showing.

The only reason that the AACP advances for thinking that the Congress might have intended to exclude cruise lines from the scope of the Commission's authority to regulate common carriers is that it would not have wanted to extend to them the antitrust immunity of the Act. *See* 46 U.S.C. App. § 1706. Even as common carriers, of course, cruise lines are still subject to the prohibition against refusals to deal in § 10(c)(1) of the Act. *See* 46 U.S.C.App.

§ 1709(c)(1). Moreover, while it does seem unfortunate to subject a workably competitive industry to common carrier regulation, that is by no means unusual in the transportation sector, as illustrated by airlines, motor carriers, and intercity buses. (The difference, of course, is that by 1984 the Congress or the regulatory agencies had, after some decades, substantially deregulated all those modes.)

In any event, it is much more likely that the Congress intended to regulate cruise ships as common carriers than it is that the Congress intended to divide jurisdiction over boycott allegations between the FMC and the district court depending upon whether a particular cruise line is "primarily involved in point-to-point carriage of passengers." We cannot imagine, much less find, any reason to think that the Congress, when it passed the Shipping Act, intended that the Commission's reach depend upon whether the passengers of the particular carrier tend to travel one-way more often than round-trip, or upon whether a majority of the passengers want to be left at another location rather than just to enjoy the ocean journey for its own sake.

### C. *Foreign-to-Foreign Cruises*

■ We agree with the AACP that a cruise that begins and ends at a foreign port, and does not stop at a domestic port, does not constitute common carriage under the Shipping Act. The definition of a common carrier in § 3(6) twice refers to the need for some contact with the United States:

> "common carrier" means a person holding itself out to the general public to provide transportation ... *between the United States and a foreign country* ... that ... utilizes, for all or part of that transportation, a vessel operating on the high seas or the Great Lakes *between a port in the United States and a port in a foreign country.*

46 U.S.C.App. § 1702(6) (emphases added). The statute thus unambiguously provides that, in order to be a common carrier, a ship must call at a port in the United States. *See also* S.Rep. No. 3, 98th Cong.,

1st Sess. 19 (1983) (definition in § 3(6) "applies only to the extent the passengers or cargo transported are loaded or discharged at a U.S. port"); *Foreign–to–Foreign Agreements—Exemption,* Docket No. 87–24, 53 Fed.Reg. 50,264 (1988), *recon. denied* (Oct. 11, 1989) (Commission proposal to allow ocean carriers to file agreements relating to foreign-to-foreign service, which would have extended to them antitrust immunity, withdrawn for want of jurisdiction, in part because § 3(6) reaches only transportation between the U.S. and a foreign port).

The carriers contend, nonetheless, that the Commission has exclusive jurisdiction to adjudicate this dispute, even with respect to any wholly foreign cruises subject to the alleged boycott agreement. The carriers' theory is that the Commission has exclusive jurisdiction with respect to any agreement among common carriers, regardless of whether it applies in part to their non-common carriage activities, and regardless of whether a non-common carrier is also a party to the agreement. We note that the Commission itself appears to have reached the opposite conclusion. In a December 12, 1988 letter to the carriers, it said that it "no longer asserts jurisdiction over those allegations of [the AACP] that concern passenger voyages having no contact with the United States."

Having, in the FMC, a single forum for all boycott cases might be more efficient, but we see no basis in the statute for holding that the Commission's power is exclusive with respect to the non-common carriage aspects of an agreement that would clearly be within the jurisdiction of the district court if other aspects of the agreement did not implicate common carriage. Although *Trans–Pacific Freight Conference of Japan v. FMC,* 314 F.2d 928, 932–33 (9th Cir.1963), suggests that the Commission does, in some circumstances, have jurisdiction over non-common carriage components of an agreement among common carriers, that case does not support the carriers' argument. First, the issue in that case—whether the Commission may review a fine imposed by an allegedly neutral body pursuant to a conference agreement—concerned the agreement generally, not just the non-common carriage components thereof. Second, and more important, neither *Trans–Pacific,* nor any other case that the carriers cite, states that the district court does not have jurisdiction over the non-common carriage aspects of an agreement among common carriers.

### III. Conclusion

We hold that a cruise line is a common carrier within the meaning of § 3(6) of the Shipping Act, except insofar as it travels only between foreign ports. To the extent that a cruise line is a common carrier, but to that extent only, a boycott agreement to which cruise lines are parties is subject to the prohibitions and procedures of the Shipping Act, rather than to those of the Clayton Act. To the extent that the district court held otherwise, we reverse and remand this matter for further proceedings.

We recognize that our holding may potentially result in some parallel litigation, before the FMC and in the district court. This is not, however, the sort of jurisdictional overlap that the Congress sought to avoid when it passed the Shipping Act. Instead, the Congress was concerned about a carrier being subject to "parallel jurisdiction," *i.e.* remedies and sanctions for the same conduct made unlawful by both the Shipping Act and the antitrust laws. *See* H.R.Rep. No. 53, 98th Cong., 2nd Sess., pt. 1, at 12 (1983), U.S.Code Cong. & Admin. News 1984, 167, 177. Under our ruling today, the carriers are subject to the power either of the district court, for the non-common carriage, or of the Commission, for the common carriage, aspects of their agreement, but in no case to both.

Were we to conclude otherwise, and submit the non-common carriage components of an agreement among common carriers to the exclusive jurisdiction of the Commission, then the parties to an agreement that violates the Clayton Act could avoid the jurisdiction of the district court merely by including in their unlawful agreement an aspect that is within the jurisdiction of the FMC, because it runs afoul of the anti-boy-

cott provision (or perhaps another prohibition) in the Act. If nothing else, the effect would be to deprive the antitrust plaintiff of the right to treble damages under the Clayton Act, remitting it to double damages under § 11(g) of the Shipping Act, 46 U.S.C.App. § 1710(g). There is no warrant in the Shipping Act for such a hostile takeover of the Clayton Act.

We leave it to the district court to consider whether, when the FMC has jurisdiction over some aspect of an agreement in suit before the court, there is a mechanism that would enable it to avoid proceedings duplicative of those before the Commission. While we must abide the allocation of jurisdiction that the Congress made, as between court and agency, we should also strive to minimize the costs of it.

*So ordered.*