376 F.2d 230
 126 U.S.App.D.C. 187
 STATES MARINE LINES, INC., and Global Bulk Transport
Corporation, Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents. Trans-Pacific Freight Conference of
Japan and Japan-Atlantic and Gulf
Freight Conference, Intervenors.
 No. 20134.
 United States Court of Appeals District of Columbia Circuit.
 Argued Dec. 6, 1966.
Decided March 8, 1967.
 
 Mr. George F. Galland and Mrs. Amy Scupi, Washington, D.C., for petitioners.
 Mr. Wm. Jarrell Smith, Jr., Atty., Federal Maritime Commission, of the bar of the Supreme Court of Texas, pro hac vice, by special leave of court, with whom Messrs. James L. Pimper, Gen. Counsel, Robert N. Katz, Sol., and Walter H. Mayo, III, Atty., Federal Maritime Commission, were on the brief, for respondent Federal Maritime Commission.
 Mr. Irwin A. Seibel, Atty., Dept. of Justice, with whom Asst. Atty. Gen. Donald F. Turner and Mr. W. Richard Haddad, Atty., Dept. of Justice, were on the brief, for respondent United States.
 Mr. John P. Meade, Washington, D.C., with whom Mr. Charles F. Warren, Washington, D.C., was on the brief, for intervenors.
 Before BAZELON, Chief Judge, EDGERTON, Senior Circuit Judge, and WRIGHT, Circuit Judge.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 Petitioners jointly operate an ocean common carrier known as States Marine Lines. They appeal from a final order of the Federal Maritime Commission approving a self-policing system adopted by two shipping conferences, the Trans-Pacific Freight Conference of Japan and the Japan-Atlantic and Gulf Freight Conference, intervenors here. Each Conference, is comprised of a number of domestic and foreign carriers,[1] States Marine among them, that ply the trade between Japan and various United States ports. The Conferences, pursuant to approval granted by the Federal Maritime Commission under Section 15 of the 1916 Shipping Act,[2] are permitted to fix rates, as well as rules and regulations, that must be adhered to by Conference members. The Conferences' self-policing system with which we are presently concerned is intended to enforce that adherence, and has been in one form or another, the subject of considerable litigation between these parties. As background, we review briefly the circumstances that have led to the present dispute.
 
 
 2
 A pervasive and perennial problem which has played havoc with the conference system generally has been that of the member who, in violation of the agreed-upon rate schedules, gives secret rebates or other concessions to a shipper in order to obtain its business. All of the numerous conferences have tried to devise effective self-policing systems to detect and punish such malpractices, without notable success. Much of the difficulty stems from the international scope of the shipping industry, a circumstance that not only augurs poorly for direct governmental policing and thus makes conference self-regulation desirable, but also places severe limitations on what the conferences themselves can realistically achieve by was of such regulation.[3] In 1961 Congress, although fully aware of the international implications involved in regulation, nonetheless expressed its concern over the industry's inability to curb malpractices and delivered a mandate to the conferences to make their self-regulation effective or risk disapproval of their conference agreements.[4]
 
 
 3
 The origin of the policing system agreed upon by the Conferences here antedates Congress' mandate by several years; however, the modifications now in dispute are, of course, in part designed to satisfy Congress' call for effectiveness. The heart of the Conferences' policing system is the use of a so-called 'Neutral Body'-- an international accounting firm selected by Conference members to investigate complaints of malpractice and to assess fines where called for. The first version of the system, adopted in 1958, required that the Neutral Body be absolutely free of any interest in or relationship with individual Conference members. A violation of this absolute-neutrality provision resulted in the invalidation of a series of fines levied against States Marine for alleged malpractices. See States Marine Lines, Inc. v. Trans-Pacific Freight Conference of Japan, 7 F.M.C. 204 (1962), aff'd sub nom. Trans-Pacific Freight Conference of Japan v. F.M.C., 9 Cir., 314 F.2d 928 (1963). A second version, as well as the third that is now before us, modified the neutrality requirement to permit disclosed professional relationships with members except where the relationship is with the company accused of malpractice. In addition, the system incorporates various rights, duties, and procedures relating to the initiation, investigation, and decision of complaints of malpractice-- some of which also have gone through several modifications.
 
 
 4
 In 1963 the Commission approved the Conferences' amendments embodying the second version of the system; States Marine appealed to this court, attacking the substance of the system as being fundamentally unfair and alleging certain defects relating to its method of adoption. In its brief, State Marine relied heavily on the then-recent Supreme Court decision in Silver v. New York Stock Exch., 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 386 (1963). Because the Commission had not had the benefit of that decision when ruling on the merits of the system, we granted its request to 'reopen and reconsider this case in light of Silver and to conduct such further proceedings as (the Commission) deems appropriate.' Upon remand the Commission vacated the order approving the amendments and, after conducting further proceedings, approved the present version incorporating a third modification of the Neutral Body system.
 
 
 5
 States Marine renews its attack on the amendments, voicing substantially the same objections raised on its earlier appeal. Its primary contention is that the system is fundamentally unfair because it fails to provide an accused line adequate safeguards against abuse. The Government[5] strongly supports States Marine's position that the system is unfair, although not in as many particulars as States Marine would have us hold. We have concluded that certain aspects of the Neutral Body system are defective, and remand the case to the Commission for further consideration. In the interest of expediting this already lengthy litigation, we shall consider all of States Marine's objections and explain why we agree or disagree with them.[6]
 
 
 6
 * In brief, as it now stands the selfpolicing system-- or more specifically article 25-- provides for the following procedures. The Neutral Body is selected by a two-thirds vote of the Conference members. It must disclose any present or future financial interests it may have in any Conference member, such an interest being a general disqualification. Likewise, it must disclose all business or professional relationships with members, but such relationships will be disqualifying only in those cases where the client is the accused. Once selected, the Neutral Body is authorized to receive written complaints of malpractice, to investigate the charges, and to assess and collect fines. In conducting the investigation, the Neutral Body may, without giving prior notice, call upon the accused and demand to see whatever records or other material the Neutral Body considers relevant; all members are obligated to cooperate in the investigation and must produce requested information. The identity of the complainant will be kept secret, and any evidence that would tend to reveal the complainant's identity will be withheld from the accused; however, the substance of the withheld evidence must be disclosed so the accused can rebut it. Once the investigation is completed the Neutral Body will notify the accused whether there are reasonable grounds to suspect malpractice, and the accused is given a specified time to prepare its defense. The accused is then entitled to a hearing before the Neutral Body, and has the right to counsel. The Neutral Body will not be restricted by legal rules of evidence or the burden of proof required in criminal or civil cases; rather it will employ rules of common sense-- that is, does the information developed persuade the Neutral Body that the malpractice occurred? Fines are to be assessed in accordance with a schedule setting forth certain maximum penalties, related to the number of times the member has been found guilty of malpractice-- $10,000 maximum for a first offense, and so on up to $30,000 for fourth and subsequent offenses; also, mitigating circumstances may be taken into account. Finally, the members agree that the Neutral Body's decision is to be 'valid, conclusive and unimpeachable * * *.' States Marine's objections place essentially all of these provisions in issue. But before we turn to these specific objections, we must first clarify the standard by which article 25 is to be judged.
 
 
 7
 All parties concede, as indeed they must, that whatever self-policing system is adopted has to accord an accused member fair treatment. In Silver v. New York Stock Exch., supra, the Supreme Court held that it could find 'no justification for anticompetitive collective action taken without according fair procedures. Congress in effecting a scheme of self-regulation designed to insure fair dealing cannot be thought to have sanctioned and protected self-regulative activity when carried out in a fundamentally unfair manner.' 373 U.S. at 364, 83 S.Ct. at 1260. The same principle applies to the scheme of self-regulation instituted by the Conferences here. They, like the Stock Exchange in Silver, are allowed by Congress, in the public interest, to engage in anticompetitive collective action-- both in fixing rates and in enforcing compliance through self-regulation. Moreover, Congress quite clearly has not sanctioned unfair regulation. The express command of Section 15 of the Shipping Act is that no agreement be approved that is 'unjustly discriminatory or unfair as between carriers * * *,' or operates 'to the detriment of the commerce of the United States,' or is 'contrary to the public interest * * *.' 46 U.S.C. 814. The question before us, therefore, is whether the self-policing system embodied in article 25 accords an accused Conference member 'fair procedures.'
 
 
 8
 In urging us to answer in the negative States Marine would have us impose upon the Conferences due process requirements that have evolved for judicial proceedings in criminal cases. But criminal due process standards do not apply all other contexts. Instead, whether particular procedures are fair depends upon the particular institutional setting involved. For, as the Supreme Court has said of 'due process' itself, 'fairness' is 'an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts.' Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960). Because the context here is not a direct governmental action against someone accused of crime, but action of a private association in a regulated industry wielding economic power and engaging in certain types of congressionally sanctioned anticompetitive behavior, the procedural guarantees an accused enjoys when the full power of the government is arrayed against him need not control the Conferences' self-policing activities. On the other hand, neither can the Conferences be permitted the freedom of action traditionally accorded such voluntary private associations as church groups or social clubs.[7] Groups that wield economic power or exist solely for economic purposes have almost uniformly been held to a higher standard of procedural formality and regularity than voluntary noneconomic organizations.[8] Shipping conferences cannot be realistically thought of as 'voluntary' organizations in the usual sense. To say that a shipping company becomes a conference member voluntarily is usually to say that it cannot exist if it remains outside the conference. As anyone familiar with the shipping industry well knows, the conferences' monopoly power exercised through the dual rate system can as a practical matter work to compel conference membership.[9] Thus not only might a company have to join a conference, but it might well be forced to remain a member even though it finds the conditions of membership objectionable. Moreover, since the conferences in acting collectively do so presumably because the public interest demands or permits it, and in so acting are subject to regulation by the Commission, it would be less than candid to consider them as wholly 'private' associations-- perhaps 'semiprivate' would be a more accurate description.
 
 
 9
 When this complex of factors is taken into account, the principle becomes obvious that this kind of self-regulatory process must provide specific, realistic guarantees against arbitrary and injurious action. The Supreme Court applied this principle in a like context in Silver,[10] and we apply it here.[11]
 
 II
 
 10
 For purposes of analysis, we shall begin our discussion with the least troublesome of States Marine's contentions.
 
 
 11
 Fines. States Marine complains that the criteria for imposing fines are too imprecise, creating the risk that penalties will be assessed disproportionately to the seriousness of the offense. We are not persuaded by this argument. Article 25 does provide maximum limits related to the number of offenses committed; and the Neutral Body is to consider relevant mitigating circumstances. This does not strike us as fundamentally unfair.
 
 
 12
 Notice. Two provisions relating to the timing of notice to the accused are subjected to attack. The first is that authorizing the Neutral Body to conduct a surprise investigation of an accused's files; the second is the provision that once the Neutral Body has found 'reasonable grounds to believe that a breach occurred' and so informs the accused, the accused has 15 days-- or a 'reasonable time thereafter as the Neutral Body may in its sole discretion grant'-- in which to defend itself against the charges. As to the first, States Marine asserts that the accused is entitled to prior notice. The Commission found, however, that surprise investigations are essential so records containing incriminating information cannot be concealed. States Marine's only answer to this is to point out that incriminating records will be hidden in any event as a matter of general precaution. Even if this is true, it is not a reason for reversing the Commission's judgment that surprise is essential; nor does it warrant adopting a system providing for advance notice, since such a system would guarantee concealment of records whereas the present at least leaves open the possibility that some evidence may be found.[12]
 
 
 13
 As far as the 15-day limitation is concerned, as a practical matter the accused line is aware of the general nature of the charge against it long before the Neutral Body completes its investigation. Experience has shown that much of the data normally will be found in the accused's own files, so the accused will, as the investigation proceeds, at least have some idea of the direction of the inquiry. Also, there is a provision for extensions of time. Under these circumstances we do not find the 15-day limitation unfair.
 
 
 14
 Neutrality. States Marine strongly protests the provision dealing with neutrality, arguing with some force that a Neutral Body should be absolutely free of any potential conflict of interest, especially since it acts as both prosecutor and judge. The Conferences and the Commission reply that limited neutrality is appropriate and necessary. Initially, they reject States Marine's assumption that the objective standard of neutrality applied in cases where governmental action is involved must apply with equal force to the private or semiprivate sector as well. We have already indicated our general agreement with the Conferences and the Commission on this point; the question remains, though, whether limited neutrality in the present context is justified.
 
 
 15
 The reasons advanced in justification are several. The first is that the practical realities of the shipping industry militate against strict neutrality. Because of the technical complexities involved in ferreting out malpractices, plus the international scope of the industry's operations, there are few qualified accounting firms that could effectively serve as a Neutral Body. The Commission found that to require strict neutrality would severely restrict, if not eliminate, the already thin number of potential Neutral Bodies. A second consideration is that almost all of the Conference members, who are intimately familiar with problems of curtailing malpractice, have agreed to a compromise position on neutrality, a position taken with the knowledge that any one of them might one day be an accused. Finally, a factor given considerable emphasis is the high ethical standards imposed upon accounting firms by the American Institute of Certified Public Accountants.
 
 
 16
 We cannot lightly dismiss the Commission's findings concerning the impracticality of requiring strict neutrality, nor can we ignore the considered judgment of those who must live with the system they have created. On the other hand, the system must provide for fair treatment of all members, not just a majority. The Neutral Body does act as prosecutor and judge;[13] its discretion in conducting the investigation-- both in obtaining and in disclosing evidence-- and in assessing penalties is very broad; and all this applies even though the member bringing the accusation may be a client of the Neutral Body. With all due respect to the high ethical standards of the accounting profession, we do not think the Neutral Body system is fair if those ethical standards are the sole assurance against a conflict of interest working to the prejudice of the accused. There should be some institutional check against the inevitable risk that ethics may not be enough. If practicalities preclude strict neutrality, which we are ready to concede, then the system must provide other assurances against abuse. For reasons to be developed, we think these assurances are missing.
 
 
 17
 Disclosure and Confrontation. One feature of the agreement generating most of the dispute in this litigation is the emphasis on keeping the identity of the complainant secret. Not only is the written complaint kept confidential, but any evidence the Neutral Body discovers is likewise kept from the accused if it 'would tend to reveal the identity of the complainant. * * * In all cases, however, the Neutral Body will inform the respondent of the nature of the alleged breach, bearing in mind basic precepts of fair play.' States Marine argues that fairness demands disclosure of the complainant's identity as well as the right of the accused to be confronted with all the evidence. Because these objections raise somewhat different questions, we consider them separately.
 
 
 18
 State Marine gives two reasons for disclosing the complainant's identity-- to inhibit unfounded accusations and to enable the accused member to rebut evidence against it. The latter assumes the complainant actually provides the Neutral Body with evidence; to the extent this is true, the problem becomes one of confrontation, which we shall consider shortly. This leaves the inhibiting effect of disclosure.
 
 
 19
 The Commission and the Conferences maintain that secrecy is critical to the success of the policing system. The Commission found that, because of the competitive situation ivolved, a shipping company will be loath to complain about a competing line's illegal concessions to a shipper for fear of incurring the shipper's wrath, thus losing any chance of obtaining its business. As one witness before the Commission put it: 'You cannot go around breaking shippers' rice bowls and get away with it.' The need for secrecy is reinforced by Congress' statement to that effect in its 1962 Report on the Ocean Freight Industry.[14] All of this provides a strong, rational basis for maintaining confidentiality, and we accept the Commission's finding that the system cannot operate otherwise.
 
 
 20
 Despite States Marine's assertions to the contrary, we are not aware of any principle of fairness that demands disclosing a complainant's identity no matter what the cost. In fact, the opposite is true; one need only refer to cases in the criminal context which have recognized that in some circumstances it may be appropriate to keep an informer's identity secret.[15] Although States Marine is undoubtedly correct that disclosure can serve a useful inhibitory function, where, as here, the inhibition would act also to eliminate the meritorious complaints, the law does not blindly demand the sacrifice.
 
 
 21
 Quite a different matter is presented, however, when secrecy is maintained at the expense of denying the accused access to the evidence used against it.
 
 
 22
 'Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right 'to be confronted with the witnesses against him.' This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases, e.g., Mattox v. United States, 156 U.S. 237, 242-244, 15 S.Ct. 337, 39 L.Ed. 409; Kirby v. United States, 174 U.S. 47, 19 S.Ct. 574, 43 L.Ed. 890; Motes v. United States, 178 U.S. 458, 474, 20 S.Ct. 993, 44 L.Ed. 1150; In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 12 L.Ed. 682, but also in all types of cases where administrative and regulatory actions were under scrutiny. E.g., Southern R. Co. v. Commonwealth of Virginia, 290 U.S. 190, 54 S.Ct. 148, 78 L.Ed. 260; Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093; Morgan v. United States, 304 U.S. 1, 19, 58 S.Ct. 773, 999, 82 L.Ed. 1129; Carter v. Kubler, 320 U.S. 243, 64 S.Ct. 1, 88 L.Ed. 26; Reilly v. Pinkus, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63. Nor, as it has been pointed out, has Congress ignored these fundamental requirements in enacting regulatory legislation. Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168-169, 71 S.Ct. 624, 95 L.Ed. 817 (concurring opinion).'[16]
 
 
 23
 True it is that we are not dealing here with direct governmental action-- but, of course, that does not render Greene v. McElroy irrelevant. The principle that an accused should not be subjected to punishment on the basis of secret evidence is too fundamental to be confined to governmental activity, and in fact has been considered basic in many instances of disciplinary action by private groups.[17] We find no reason why this principle should not govern the Conferences' government sanctioned self-regulation as well.
 
 
 24
 Actually, neither the Commission nor the Conferences seriously disputes this proposition. What they do dispute is the necessity of disclosing all the evidence in its original form at the expense of disclosing the complainant's identity. Essentially, their argument is that limited disclosure can be accomplished without running afoul of the principle of Greene v. McElroy. This is so, they say, because article 25 requires the Neutral Body, whenever it decides it must withhold evidence, to reveal the substance of the evidence in sufficient detail to enable the accused to rebut it. To do less would be contrary to the article 25's standard of 'fair play.'[18]
 
 
 25
 The nub of the problem, however, is who is to decide whether the accused has been accorded 'fair play'? How does a Neutral Body decide how much disclosure of evidence is sufficient? What assurance is there that a Neutral Doby, zealous in its protection of the complaint's anonymity, does not thereby become less zealous in its concern for the accused?[19] The answers, we are told, are to be found in the high ethical standards of international accounting firms and the fact that only rarely will critical evidence come from sources other than the accused's own files. But these really are not answers so much as assertions that the probability of arbitrary action is so slight as to call for no more protection than is presently provided. As we have already indicated, we do not think shipping companies, or the public interest they necessarily represent, should have to rely on probabilities as their sole assurance against abuse, especially where enforcement of those rights depends on the good will both of a body combining prosecutorial and adjudicative functions and of the accused's competitors.
 
 
 26
 The Conferences, parting company with the Commission, seek to show that article 25 does contain an important check against abuse, asserting that 'any evidence which is not made available at the hearing in one manner or the other may not be relied upon as a basis for decision.' This assertion by counsel, however, is contrary to the language of article 25, which provides that the Neutral Body 'shall consider all of the available evidence' in making its decision. Moreover, the Hearing Examiner expressly rejected the Conferences' construction of the article,[20] a determination the Commission not only did not dispute but has implicitly accepted as correct. Even if the Conferences' interpretation were accepted, it borders on the absurd to think that the Neutral Body could, when reaching its decision, exclude from its deliberation evidence brought to its attention during the investigatory process. Consequently, article 25 must be read as not preventing a Neutral Body from basing its decision on evidence the accused has no chance to confront in original form. States Marine's contention that the Conferences' self-policing system in this respect conflicts with the principle of Greene v. McElroy is therefore well founded.
 
 III
 
 27
 The Government, a statutory respondent in this appeal, agrees with States Marine that the disclosure-of-evidence provision is inadequate in its protection for the accused and, when viewed against the background of other provisions of article 25, is fundamentally unfair.[21] Rather than urge that the Neutral Body system be scrapped, however, the Government has come forward with a proposal which accepts the Commission's determination that effective self-regulation demands such a system but which at the same time seeks to accommodate the obvious need for some kind of institutional check on Neutral Body discretion. Building on the Conferences' own suggestion that undisclosed evidence be screened out of the ultimate decisionmaking process, the Government recommends that a Neutral Body's decision to penalize a member be subject to review by a panel of arbitrators[22] who are free of any relationship with Conference members.
 
 
 28
 Under such a system the Neutral Body would have to demonstrate the accused's guilt by using only the evidence made available to the accused. In addition, we presume, the arbitrators would take into account any rebutting evidence provided by the accused. This system would maintain the complainant's anonymity, yet substantially eliminate the danger of improper conviction on the basis of secret evidence, since the arbitrators would never see or be influenced by non-disclosable information. Such a proposal does not, of course, provide all the guarantees of actual confrontation,[23] nor does it necessarily resolve all the potential problems that could arise from a Neutral Body's exercise of its discretionary power. Nevertheless, providing an independent check of the disclosed evidence would largely neutralize any substantial abuse of discretion by the Neutral Body, and this, we think, is all that can reasonably be asked. Since the Government's proposal would provide article 25 with this needed element of fairness, we accept it as a workable and desirable compromise between the realities of Conference self-regulation and the rights of an accused member.[24]
 
 
 29
 The Commission and the Conferences oppose the Government's suggestion, however, their chief argument being that a right of appeal already exists: not to an arbitration panel, but to the Commission itself under Section 15 of the Shipping Act. This argument is rather remarkable, for not only does article 25 stipulate that the Neutral Body's decision is 'final, conclusive and unimpeachable,' but the Commission expressly rejected appeal as unnecessary and disruptive. /25/ Nonetheless, the argument is made here and we shall consider it.
 
 
 30
 The right of appeal, say the Commission and the Conferences, inheres in Section 15's mandate to the Commission to 'disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers * * *, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter.'[26] From this they conclude that the Commission may prevent any form of arbitrariness or unfairness in a Neutral Body's decision by disapproving the Conferences' self-policing provisions or by condemning any unapproved interpretation of them, citing for the latter proposition Trans-Pacific Freight Conference of Japan v. F.M.C., 9 Cir., 314 F.2d 928 (1963). More precisely, the argument is that whenever an accused member has a complaint about the propriety of a Neutral Body's action the member can obtain review simply by alleging that the Neutral Body violated article 25's requirement of 'fair play.'
 
 
 31
 We cannot agree that Section 15 makes available the kind of continuing, case-by-case review contemplated by the Government's arbitration proposal. Nor do we read the Ninth Circuit's decision in Trans-Pacific, supra, as saying otherwise. There the question was whether the Neutral Body and its agent were 'employed by' a conference member and thus in violation of the absolute neutrality requirement of article 25, as it then stood. The conference contended that the type of relationship in question did not constitute employment in the sense 'employed by' was used in article 25. The court, however, upheld the Commission's jurisdiction both to decide what it understanding of the term had been at the time it approved the agreement and to invalidate conference action that effectively amended that original interpretation.
 
 
 32
 The type of Commission review proposed here is totally dissimilar to that approved in Trans-Pacific. The Conferences' and the Commission's review proposal would involve the Commission in the task of examining all the evidence presented to the Neutral Body and deciding whether-- in the Commission's judgment-- the Neutral Body, in disclosing the substance of that evidence to the accused, stayed within the limits of 'fair play.'[27] This, of course, is not the responsibility assigned the Commission by Section 15. Section 15 authorizes the Commission to 'disapprove, cancel or modify any agreement,' not to sit in judgment of the day-to-day operations carried out under that agreement. Moreover, to place the Commission in the role of an on-going appellate panel, intimately involving it in a case-by-case review of the Conferences' Neutral Body system, would hardly be consistent with Congress' intent that the Conferences engage in self-regulation. As was said in Trans-pacific, 'the Commission (is) an administrative body set up for the purpose of dealing administratively with problems presented from time to time under the Shipping Act,' 314 F.2d at 953; that purpose would not be served were we to accept the broad reading of Section 15 being urged upon us here.[28]
 
 
 33
 We hold, therefore, that, given the special characteristics of the shipping industry and the conference system, the broad discretion granted a Neutral Body must be subject to some form of continuing internal review. That review must provide reasonable assurance that a member will be penalized only on the basis of evidence it has an adequate opportunity to rebut or explain-- in other words, that the accused will in fact be treated fairly. Although the Commission is, of course, not bound to adopt in all specifics the plan suggested by the Government, we think that suggestion provides a useful model for the appropriate modification of article 25. The Commission's order is reversed for further proceedings consistent with this opinion.
 
 
 34
 So ordered.
 
 
 
 [1]
 The Commission shows Trans-Pacific as having 20 members and Japan-Atlantic 15 members
 
 
 [2]
 46 U.S.C. 814
 
 
 [3]
 See generally H.R(ep). No. 1419, 87th Cong., 2d Sess. 303-319 (1962). See also Note, Rate Regulation in Ocean Shipping. 78 HARV.L.REV. 635-642 (1965)
 
 
 [4]
 'The Commission shall disapprove any such agreement, after notice and hearing, on a finding of inadequate policing of the obligations under it * * *.' 46 U.S.C. 814, as amended, 75 STAT. 764 (1961). See H.REP.No. 498, 87th Cong., 1st Sess. 10-11 (1961)
 
 
 [5]
 Statutory respondent pursuant to 28 U.S.C.A. 2344 (1966), formerly 5 U.S.C. 1034
 
 
 [6]
 Apart from its attack on the system itself, States Marine alleges two further reasons why these latest modifications should not have been approved. Neither allegation has merit
 First, States Marine urges that a self-policing agreement can be adopted only with the unanimous consent of all Conference members. The short answer to this is that the voting provisions of the basic Conference agreement, to which States Marine has assented, expressly provide otherwise. And States Marine has not shown that the voting provisions themselves violate 15 of the Shipping Act, 46 U.S.C. 814. See Aktiebolaget Svenska Amerika Linien v. F.M.C., 122 U.S.App.D.C. 59, 351 F.2d 756 (1965).
 Second, States Marine maintains that the Conferences' modifications of the second version of the Neutral Body system should have been excluded from consideration by the Examiner and the Commission. These modifications were adopted by the Conferences, with States Marine present, in response to specific objections States Marine had made concerning various aspects of the system. We see no reason why they should not have been taken into account. Under 15 the Commission has the authority to modify agreements in appropriate circumstances; certainly in doing so it ought to be able to consider what the Conferences themselves have agreed upon by way of modification-- at least in the circumstances of this proceeding. States Marine suggests that it was deprived of a hearing on its objections to the modifications. It is clear, however, that this is not true. Not only did States Marine have the opportunity to argue its objections in its brief to the Commission, but more importantly the modifications raised no issues that had not already been explored in depth during the hearings on the slightly different second version. Cf. Florida Economic Advisory Council v. F.P.C., 102 U.S.App.D.C. 152, 157, 251 F.2d 643, 648 (1957), cert. denied, 356 U.S. 959, 78 S.Ct. 996, 2 L.Ed.2d 1066 (1958).
 
 
 [7]
 See generally Developments in the Law-- Judicial Control of Actions of Private Associations, 76 Harv.L.Rev. 983 (1963)
 
 
 [8]
 See, e.g., Cason v. Glass Bottle Blowers Ass'n, 37 Cal.2d 134, 231 P.2d 6, 21 A.L.R.2d 1387 (1951) (labor union); Nametra, Inc. v. American Soc'y of Travel Agents, Inc., 28 Misc.2d 291, 211 N.Y.S.2d 655 (Sup.Ct., 1961) (trade association); Harmon v. Matthews, 27 N.Y.S.2d 656 (Sup.Ct.1961) (labor union). And see Developments in the Law, supra Note 7, at 1032-1034. See also Silver v. New York Stock Exch., 373 U.S. 341, 364-366 nn. 17-18, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963)
 
 
 [9]
 The dual rate system is described in Federal Maritime Bd. v. Isbrandtsen Co., 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958), which held the system unlawful. Congress subsequently legalized the dual rate system, but imposed certain safeguards. See generally Note, Rate Regulation, supra Note 3
 
 
 [10]
 The Commission and the Conferences seek to distinguish Silver as being concerned with concerted action taken against a non-member of the association; members they suggest, are entitled to lesser protections. Given the characteristics of the conference system, however, this argument seems largely beside the point. In any event, most of the authorities the Court relied upon as establishing the 'basic nature of the rights' a non-member is entitled to were cases involving disciplinary action by associations against members. See 373 U.S. at 364 n. 17, 83 S.Ct. 1246. Neither those cases, nor the Court's opinion, justify lesser controls over concerted action of the kind we have here simply because it affects a member
 
 
 [11]
 The Conferences maintain that we are premature in our assessment of article 25, that we should wait until an accused member actually complains of mistreatment to decide whether the procedures accorded are unfair. While we agree with the general proposition that courts should not engage in undue speculation as to how procedures are likely to be carried out in practice, cf. Fahey v. Mallonee, 332 U.S. 245, 256, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947), that does not mean a court should stay its hand where unfairness is obvious. We think this especially true in the present proceeding for the reasons nicely stated by the Supreme Court in Silver: 'The according of fair procedures is of fundamental significance, * * * serious and irreversible economic injury may result from their denial in a context like that of the present case, and * * * a substantive inquiry after the fact cannot possibly succeed in accurately ascertaining retrospectively what the outcome would have been had the procedural safeguards been afforded in the first instance.' 373 U.S. at 366 n. 18, 83 S.Ct. at 1261
 
 
 [12]
 We reject for the same reason States Marine's assertion that an accused should have the option of having the investigation made by the accused's own auditors under Neutral Body supervision, since this would necessarily entail giving the accused advance warning
 
 
 [13]
 The Hearing Examiner found that 'Neutral Body functions are actually factfinding rather than judicial * * *.' Even accepting the Conferences' interpretation of this finding as meaning that the Neutral Body does not preside over an adversary system of justice, the fact remains that the Neutral Body alone decides whether or not, on the facts found, a malpractice has occurred and what fine is to be imposed. Such decisions are like 'judicial' decisions
 
 
 [14]
 H.R.REP. No. 1419, 87th Cong., 2d Sess. 316 (1962)
 
 
 [15]
 E.g., Roviaro v. United States, 353 U.S. 53, 62, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957)
 
 
 [16]
 Greene v. McElroy, 360 U.S. 474, 496-497, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)
 
 
 [17]
 See, e.g., Cason v. Glass Bottle Blowers Ass'n, supra Note 8; Avery v. Moffatt, 187 Misc. 576, 582, 55 N.Y.S.2d 215, 221 (Sup.Ct.1945) (stock exchange); Taxicab Drivers' Union, No. 889 v. Pittman, 322 P.2d 159 (Okl.1957). And see Developments in the Law, supra Note, 7, at 1029-1034
 
 
 [18]
 The Commission stated it thus: 'It is our view, if the accused is not sufficiently informed of the charges against him and the evidence in support thereof so as to prepare his rebuttal, the elements of fundamental fairness are missing.'
 
 
 [19]
 Take, for example, the problem of deciding what constitutes the 'substance' of the evidence. It would seem hardly fair, in the case of critical oral testimony to the Neutral Body, to make the accused base its rebuttal on the Neutral Body's condensed, hearsay version of that testimony. Ideally, the witness should be available for cross-examination; at least provision should be made for reducing witnesses' statements to writing. Compare Avery v. Moffatt, supra Note 17. While the need for maintaining the complainant's anonymity is justifiable, it does not justify unnecessarily relegating the accused to possibly unreliable sources of information
 
 
 [20]
 Jt.App. 350 n. 23: 'Conference counsel appears to take the position that Hearing Counsel's concern in this regard has been obviated by the latest modifications which are said to provide that evidence not shown to an accused will not be made the basis of findings. This may be the intent but a careful reading of the latest version of Article of Article 25(f)(3) does not bear it out.'
 
 
 [21]
 The Government cites as the three principal defects which create the potential for unfairness: (1) the possibility that the anonymous complainant may be a client of the Neutral Body; (2) the risk that decisions will be based on secret evidence; (3) the grant of sole and final decision-making authority to the Neutral Body with no provision for review
 
 
 [22]
 The Government recommends three arbitrators. Although we use the plural, we intimate no opinion as to the appropriate number-- whether it be one or several
 
 
 [23]
 It may be that the undisclosed evidence is favorable to the accused and were it disclosed the arbitrators would be less impressed by the disclosed evidence. Nonetheless, the parties appear to be primarily concerned with the prospect of a Neutral Body withholding unfavorable evidence which, unrebutted or unexplained, will prejudice its decision against the accused. We agree that this is the most critical defect of article 25 and the one demanding a remedy
 
 
 [24]
 Congress, too, apperas to have been aware of the need for review of Neutral Body decisions. See H.REP, No. 1419, 87th Cong., 2d Sess. 304-305, 308, 313, 318-319 (1962)
 
 
 [25]
 The Commission's various reasons for rejecting appeal are without merit. (1) Appeal is a matter of grace, not right. However, the cases establishing that proposition also assume that the thwarted appellant has been accorded one fair hearing already, e.g., Ohio ex rel. Bryant v. Akron Metropolitan Park Dist., 281 U.S. 74, 80, 50 S.Ct. 228, 74 L.Ed. 710 (1930), an assumption that in the present context begs the question. (2) A Neutral Body would be 'better qualified to decide than a panel of arbitrators.' We find nothing in the reocrd, though, that supports this view. Certainly it is hard to believe that the world lacks enough individuals qualified to perform the limited function called for by the Government's proposal. (3) Appeal would cause delay. It is not clear, however, in what way any delay created by subjecting a decision, once made, to immediate review would destroy the system's effectiveness. And the accused should not be deprived of fair treatment simply in the interests of efficiency. (4) 'Some of the candidates for the Neutral Body position indicated they would not serve if their decisions were to be subject to appeal.' Again, as with the delay argument, this is hardly sufficient reason to deny an accused important rights. (5) Review would result in disclosure of the complaint's identity. This objection disappears, of course, if the reviewing body looks only at the evidence made available to the accused
 
 
 [26]
 See also 46 U.S.C. 821, which provides that 'any person may file with the Federal Maritime (Commission) a sworn complaint setting forth any violation of this chapter by a common carrier by water * * * and asking reparation for the injury, if any, caused thereby. * * *'
 
 
 [27]
 And in reviewing all of the evidence the Commission must necessarily breach the precious veil of secrecy surrounding the complainant's identity, a problem neither the Conferences nor the Commission appear to have foreseen
 
 
 [28]
 The Conferences amass a series of further reasons for rejecting the Government's proposal. Thus, they assert, arbitrators would not appreciate what kind of fine is required to discourage malpractice; subjecting Neutral Body decisions to review wound, in the present 'climate' in the Conferences, lower the essential deterrent effect of the system; arbitrators can be as readily corrupted as the Neutral Body. Since the Conferences have conceded the approprateness of review to check arbitrary action, however, these assertions ring somewhat hollow. In any event, they do not persuade us to reject what seems to be a reasonable solution incorporating many essentials the Conferences themselves have apparently recognized as beneficial