**PACIFIC COAST EUROPEAN CONFERENCE and Its Member Lines, Petitioners,**

v.

**FEDERAL MARITIME COMMISSION and United States of America, Respondents,**

**States Marine Lines, Inc., & Global Bulk Transport, Inc., Intervenors.**

**STATES MARINE LINES, INC., and Global Bulk Transport, Inc., Petitioners,**

v.

**FEDERAL MARITIME COMMISSION and United States of America, Respondents,**

**Pacific Coast European Conference et al., Intervenors.**

**Nos. 22407, 23330.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 19, 1970.

Decided Oct. 16, 1970.

Certiorari Dismissed March 17, 1971. See 91 S.Ct. 990.

14. *Id.*

Wilbur K. Miller, Senior Circuit Judge, concurred in part and dissented in part and filed opinion.

———◆———

Mr. John P. Meade, Washington, D. C., for petitioners in No. 22,407 and intervenors in No. 23,330.

Mr. George F. Galland, Washington, D. C., with whom Mrs. Amy Scupi was on the brief, for petitioners in No. 23,-330 and intervenors in No. 22,407.

Mr. Paul J. Fitzpatrick, Attorney, Federal Maritime Commission, with whom Messrs. James L. Pimper, General Counsel, H. B. Mutter, Deputy Solicitor, Federal Maritime Commission, and Irwin A. Seibel, Attorney, Department of Justice, were on the brief, for respondents. Messrs. Robert N. Katz, Solicitor, Federal Maritime Commission,

Norman C. Barnett, Attorney, Federal Maritime Commission, and Kenneth H. Burns, Solicitor, Federal Maritime Commission at the time the record was filed, also entered appearances for respondent Federal Maritime Commission.

Before WILBUR K. MILLER, Senior Circuit Judge, WILKEY, Circuit Judge, and DAVIES,* Judge, U. S. District Court for the District of North Dakota.

WILKEY, Circuit Judge:

This combined appeal arises from two decisions of the Federal Maritime Commission. The first invalidated the self-policing procedures of the Pacific Coast European Conference as not measuring up to the principles of fundamental fairness required by our decision in States Marine Lines, Inc. v. Federal Maritime Commission (States).[1] Subsequently, the Conference adopted new self-policing procedures which satisfied the fairness principles of States, and in so doing made the application of these procedures retroactive to the date of the States decision. In the second of the two decisions here in issue, the Federal Maritime Commission approved the latter provision under Section 15 of the Shipping Act, as amended,[2] thereby allowing the Conference to prosecute States Marine for alleged infractions of the Conference Agreement during membership according to the new procedures, although prior to their adoption States Marine had resigned from the Conference.[3]

I. *Background*

    A. *Shipping Conferences and Their Self-Regulation*

Shipping conferences are made up of ocean carriers sailing under the flags of many nations. Only a minority of the lines in shipping conferences serving the foreign trade of the United States fly the American flag. Conferences were first formed about 100 years ago in order to eliminate destructive competition between ocean carriers arising out of overtonnage. In order to provide stability, the conference agreements normally contained provisions fixing rates, sailings, and practices over routes in which members' ships were engaged.[4]

The Shipping Act of 1916 was enacted in response to abuses which had become evident in the conference systems affecting the foreign trade of the United States. It eliminated the most dangerous predatory weapons in the hands of the conferences, and expressly granted antitrust immunity to the conferences in their rate-fixing and adoption of uniform practices, provided that the conferences submitted their agreements to the appropriate United States regulatory body for approval.[5]

Despite their obvious anticompetitive effect, conferences were not eliminated from the foreign trade of the United States, because they were viewed as necessary to American shippers and because of supposed advantages to this nation's trade. Conferences were thought to produce "greater regularity and frequency of service, stability and uniformity of rates, economy in the cost of service, better distribution of sailings, maintenance of American and European rates to foreign markets on a parity, and equal treatment of shippers through elimination of secret agreements and underhanded methods of discrimination." [6]

---

* Sitting by designation pursuant to Title 28, U.S.Code, Section 292(c).

1. 126 U.S.App.D.C. 187, 376 F.2d 230 (1967).

2. 46 U.S.C.A. § 814.

3. States Marine's resignation was effective 1 December 1967. The Conference did not adopt the provision applying its fair hearing provisions retroactively to the

date of the *States* decision until October 1968.

4. H.Rep.No.498, 87th Cong., 1st Sess. 4–6 (1961). *See also* Note, Rate Regulation in Ocean Shipping, 78 Harv.L.Rev. 635–642 (1965).

5. H.Rep.No.498, 87th Cong., 1st Sess. 5 (1961).

6. *Id.*, at 4–5.

Since a conference's effectiveness, and ultimately its very existence, is dependent upon the extent to which its members live up to the conference agreement and refrain from such violations as granting shippers secret rebates, it is of vital importance that conferences regulate their own members and police their own agreements.[7] The Shipping Act of 1916 recognized the need for self-regulation of international shipping through the means of shipping conferences, and most of the conference agreements approved under the Shipping Act up to 1961 contained such provisions. However, in that year Congress, concerned by the laxity of the conferences in policing their own memberships, amended Section 15 of the Shipping Act to require the appropriate regulatory body (then the Federal Maritime Board) to disapprove any conference agreement not including "effective provisions for policing the obligations under it," and further directed the F.M.B. to disapprove any conference agreement if it should find inadequate policing in fact despite any language in the agreement.[8]

The self-policing provisions of shipping conferences came to the attention of this court in 1967 in *States*. In that case, we followed the lead of the Supreme Court in Silver v. New York Stock Exchange,[9] where the Court in relation to stock exchanges, which like shipping conferences are given limited statutory immunity from the antitrust laws, said: "Congress in effecting a scheme of self-regulation designed to assure fair dealing cannot be thought to have sanctioned and protected self-regulative activity when carried out in a fundamentally unfair manner."[10] Consequently, we found that conference agreements falling within the scope of the Shipping Act

must provide a fair self-regulatory process.

But it was not essential, we said, that to be "fair" to an accused line, a conference had to accord it all the due process requirements that have evolved in our criminal law. We recognized the elusiveness of the concept of fairness and noted its dependence "upon the particular institutional setting involved."[11] Because of the economic power wielded by shipping conferences we did hold them to a higher standard of procedural formality than that required for voluntary non-economic organizations. This standard, we found, requires that the "self-regulatory process must provide specific, realistic guarantees against arbitrary and injurious action."[12]

### B. *The Pacific Coast European Conference and Origins of the Current Controversy*

Pacific Coast European Conference is composed of numerous foreign and domestic shipping lines operating between ports on the United States Pacific Coast and ports in Europe. It was established in 1937 pursuant to an agreement approved by the Federal Maritime Commission under Section 15 of the Shipping Act of 1916. Under the self-policing provisions of this agreement, the determination of guilt for infractions and the penalties assessed therefor were left to a three-fourths vote of the membership present at a duly called meeting, with the accused line casting no vote. No procedures were set forth in the agreement giving the accused line access to the evidence to be used against it, or allowing the accused to rebut or explain the evidence, and there was no guarantee of an original or appellate

---

7. H.R.Rep.No.1419, 87th Cong., 2d Sess. 303 (1961).

8. 46 U.S.C. § 814, as amended, 75 Stat. 764 (1961). *See also* H.Rep.No.498, 87th Cong., 1st Sess. 10–11 (1961).

9. 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

10. *Id.*, at 364, 83 S.Ct., at 1260. (Footnote omitted.)

11. 126 U.S.App.D.C., at 192, 376 F.2d, at 235.

12. *Id.*, at 193, 376 F.2d, at 236.

hearing before a disinterested and impartial tribunal on either the matter of guilt or the assessment of penalties.

On 13 March 1967 counsel for the Conference recommended that the above procedures be changed to include "fairness" provisions consonant with our *States* decision, which had been handed down less than two weeks before. Under the conference agreement, all major changes had to be approved unanimously by the members before adoption, and at a meeting in June 1967 attended by 21 of the 22 conference members, including States Marine, all 21 voted for adoption. However, shortly thereafter States Marine withdrew its affirmative vote; still later Weyerhauser Lines, the absent member, cast a negative vote on the proposal. Thus no changes were made to the self-policing provisions of the Agreement.

In August 1967 the comptroller of the Conference informed the chairman of the results of an investigation that he had conducted which indicated that States Marine had paid rebates to certain shippers in violation of the conference agreement. The chairman formally notified States Marine of the charges. But rather than submit to adjudication of its guilt or innocence under the procedure set out in the conference agreement, States Marine countered with a complaint to the Federal Maritime Commission alleging that the Conference's self-policing system was illegal under *States*. At about the same time, it sought and was granted a temporary restraining order and preliminary injunction from a United States District Court preventing the Conference from proceeding with any self-policing action against it. On the Conference's motion to set aside the preliminary injunction, the two parties stipulated that the Conference could proceed with its self-policing action, but was restrained from attempting to collect any penalty assessed.

During the pendency of the Federal Maritime Commission's action the possibility of settlement between States Marine and the Conference was explored. Upon failure of these efforts States Marine resigned from the Conference, effective 1 December 1967. Thereafter, pursuant to the self-policing provisions then in effect, the Conference found States Marine guilty of violating the conference agreement and assessed a fine of $130,000.00.

II. *The Commission Decision Holding Conference Self-Policing Procedures "Legally Defective" Prior to Formal Approval by the Conference and the Commission*

In June 1968 the Commission rendered its decision [13] that the Conference's self-policing system was indeed illegal under *States,* as had been argued by States Marine in this action brought by States Marine. The Commission ordered the Conference to cease and desist from further action under the existing self-policing system until appropriate amendments were made and approved by the Commission. The Conference's assessment was thus held void. But in voiding it the Commission said, "This does not mean, however, that the Conference has lost its right of action against States Marine for alleged wrongdoing prior to its resignation from the Conference."

The Conference contends that the Commission was wrong in this decision. It argues that our *States* decision was self-executing, and the Conference's duty of compliance was operative at once independent of any further approval under the Shipping Act. It is urged that nowhere in *States* is there the slightest hint that an agreement which leaves open the procedures to be followed must be struck down when the explicit procedures required by the principles of *States* are in fact permitted and are followed to the letter. And, in support of this proposition, the Conference notes that unfairness was obvious in the provisions of the conference agreement under consideration in *States,* and emphasizes the fact that in defining what

13. F.M.C. Order of 27 June 1968, on appeal, in No. 22,407.

constitutes fairness in the context of shipping conference self-regulation, we said the "self-regulatory *process* must provide specific realistic guarantees." [14] In other words, the Conference deems significant the fact that we never said explicitly that these guarantees must be reduced to writing and approved by the Commission.

To accept this argument would be to say that the Commission must review the self-policing actions of the conferences on an individual case-by-case basis to be sure that the accused lines received fairness of treatment in accordance with the principles of the *States* decision. This is a wholly unpalatable result, not at all in accordance with our reasoning in *States*.

First, in that decision we specifically rejected the suggestion that the fairness of conference self-policing action be reviewed by the Commission on a case-by-case basis. We said, "Section 15 authorizes the Commission to 'disapprove, cancel, or modify any agreement, not to sit in judgment of the day-to-day operations carried out under that agreement. * * * '" [15] Second, "[t]o place the Commission in the role of an on-going appellate panel, intimately involving it in a case-by-case review of the conferences' Neutral Body system would hardly be consistent with Congress' intent that the conferences engage in *self*-regulation." [16] Third, to hold as the Conference urges would be inconsistent with our previous holding in Outward Continental North Pacific Freight Conference v. Federal Maritime Commission [17] that the Commission under Section 15 has the statutory obligation to require specific (and fair) self-policing procedures in conference agreements.

■ *States*, then, was not self-executing in the manner urged by the Conference, but rather required affirmative action by the conferences amending the

agreements filed with the Federal Maritime Commission to embody self-policing provisions which conformed to the principles of *States,* if none already existed. We therefore affirm the Federal Maritime Commission's decision in No. 22,-407.

III. *The Commission Decision Holding a Conference Agreement Amendment, Incorporating Procedural Rules Required by a United States Court of Appeals Decision and Approved by the Commission, Valid and Effective as to an Ex-Member's Violations Incurred While a Member*

We next proceed to consideration of the Commission's second decision, from which States Marine, not the Conference, appeals.

In October 1968 the Conference submitted an amendment incorporating the fair hearing principles of *States* for Commission approval. This was approved in November. But prior to this approval, the Conference submitted a further amendment to the self-policing provisions of the conference agreement which would allow the Conference "[t]o investigate and prosecute pursuant to those provisions [*i.e.*, the new fair hearing provisions], any alleged breaches brought to its attention at any time after March 8, 1967," the date of our *States* decision. This was in presumed implementation of the Commission's language in its June 1968 decision, quoted p. 2536, *supra.*

States Marine protested to the Commission this last amendment, but, after due investigation, the Commission approved it under Section 15 of the Shipping Act. Approval became effective in July 1969.[18]

Before this court States Marine has not argued that the Conference may not have a right of action against it based upon its conduct while a member

14. 126 U.S.App.D.C., at 193, 376 F.2d, at 236. (Emphasis added.)

15. *Id.,* at 198, 376 F.2d, at 241.

16. *Id.,* at 199, 376 F.2d, at 242.

17. 128 U.S.App.D.C. 199, 385 F.2d 981 (1967).

18. F.M.C. Order of 25 July 1969, on appeal in No. 23,330.

of the Conference. It concedes that liability for breaches of the conference agreement would "survive resignation and be court enforceable." But against any application of the new fair hearing procedures to previous substantive offenses States Marine argues

(1) that approval of retroactive application of the new fair hearing procedures amounts to unlawful retroactive approval under Section 15, and further,

(2) that such approval makes it answerable to the Conference's charges "under a private penal system prescribed by a contract to which States Marine was not a party."

### A. *Alleged "Retroactive" Approval Under the Shipping Act*

The first question raised by States Marine lends itself to a three-pronged analysis, directed to determining if approval of retroactive application of the Conference's new self-policing provisions offends either, first, any of the express terms of the Shipping Act, as amended; or, second, the Congress' intent in enacting the Shipping Act and its amendments as manifested in the legislative histories thereof; or, third, any other public policy relevant to these questions.

The only provision of the Shipping Act here relevant is Section 15, which was totally rewritten by the legislature in the amendments to the Act of 1961. States Marine argues that the terms of this Section as interpreted in Carnation Company v. Pacific Westbound Conference,[19] River Plate and Brazil Conferences v. Pressed Steel Car Co.,[20] Mediterranean Pools Investigation,[21] Agreements T–2108 and T–2108–A,[22] and Agreement T–2138 [23] prohibit the Commission from approving retroactive application of the new fair hearing provisions adopted by the Conference. Specific reliance is placed upon the following language from *Carnation*, where the Supreme Court said:

> Although the Commission can approve prospective operation under agreements which have been implemented without approval, respondents concede that the Commission has no power to validate pre-approval implementation of such agreements.[24]

Reliance is also placed upon the following language of the Federal Maritime Commission in *Mediterranean Pools:*

> [S]ection 15 clearly prohibits approval of an agreement or any modification or extension thereof which bears an effective date earlier than the date of our approval.[25]

■ We agree wholeheartedly with the proposition that the terms of Section 15 prohibit the Commission from ratifying conduct of the conferences which has transpired prior to the date of the Commission's actual approval of the agreements. That is settled law as amply demonstrated by the case law cited above. But also, that is *not* the situation here: In approving retroactive application of the Conference's new fair hearing procedures, the Commission was not deciding a substantive question of legality or illegality by ratifying or condemning past conduct, but instead was merely providing a legitimate procedure by which member lines' past misconduct (already so defined by substantive provisions) could be fairly tried and penalized.

We are not dealing here with substantive provisions of the agreement which in any way make punishable conduct heretofore not punishable. The right of action against violations of the type allegedly committed by States Marine was given the Conference by provisions of the agreement which were in effect

19. 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966).

20. 227 F.2d 60 (2d Cir., 1955).

21. 9 F.M.C. 264 (1966).

22. P&F, 10 S.R.R. 556 (1968).

23. P&F, 10 S.R.R. 571 (1968).

24. 383 U.S., at 222, 86 S.Ct. at 787.

25. 9 F.M.C., at 303.

from the beginning of States Marine's membership. And this was conceded by States Marine. The provisions which were allowed to be applied retroactively by the Commission were strictly procedural in nature and were in fact designed to guarantee the accused a fair hearing—something it was not guaranteed before.

From our review of the legislative history of the Shipping Act, and in particular Section 15, it is clear that Congress never considered what the effect would be on the conference self-policing systems if the courts of this country forced them to adopt fairer hearing procedures in order to maintain the numerous advantages of self-regulation, e.g., their exemption from the United States' antitrust laws. However, it is clear that Congress did intend for the conferences effectively to police themselves.[26] It is also clear that effective self-policing cannot take place if the conferences are left in a procedural no-man's-land in prosecuting charges brought against member lines in the interval between the time of our States decision and the time new self-policing procedures are approved by the Commission. Moreover, it would be violative of the principles of our States decision to permit the conferences to continue to prosecute charges brought in this interval according to their former deficient procedures.

We can perceive no relevant public policy which would be offended by allowing the new fair hearing procedures adopted by the Conference to be applied to offenses committed at a time prior to their adoption. Even in our own criminal law, where the rights of the accused are jealously protected, application of purely procedural changes to crimes committed prior to their adoption has been upheld. And this has been true in some instances where the procedural changes have operated to the limited disadvantage of the accused.[27] If it does not offend public policy or the Constitution to apply procedural changes in this way retroactively in a criminal case—where, as we pointed out previously, a higher standard of due process or fairness than that necessary in a shipping conference self-policing forum need apply—it is difficult to see how retroactive application of procedural changes in the latter could be objectionable. In our view this is especially true where, as here, the procedural changes are designed to give the accused a fairer hearing than that to which it would have been entitled under the former procedures.

Accordingly, we find that it is not at all inconsistent with the express terms of the Shipping Act as amended, the congressional intent in enacting the statute, or any relevant public policy to permit the Conference to apply its fairer self-policing hearing procedures retroactively to the investigation and prosecution of any offenses brought to its attention after the date of our decision in States.

---

26. "In practice, as testimony before this committee and the Judiciary Committee established, the self-policing systems in use by the conferences were ineffective and the supervision of the Federal Maritime Board was considerably less than sufficient to insure observance of the conference agreements and of U.S. law. Accordingly, the bill contains a provision requiring the inclusion of *effective* policing provisions in the conference agreement and requires the conference to exercise such policing power *effectively* on penalty of subsequent disapproval of the agreement." H.Rep.No.498, 87th Cong., 1st Sess. 10 (1961). (Emphasis added.)

27. *See* Beazell v. Ohio, 269 U.S. 167, 170, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925), where the Supreme Court ruled that the prohibition in Art. 1, Sec. 9 & 10 of the Constitution against the enactment of *ex-post facto* laws did not apply to statutory changes in strictly procedural matters, even though they may operate to the disadvantage of the accused "in a limited and unsubstantial manner." *See also* Payne v. Nash, 327 F.2d 197 (8th Cir., 1964), and Poole v. United States, 329 F.2d 720 (9th Cir., 1964).

### B. Effect of Resignation of States Marine Prior to Adoption of the Conferences' New Fair Hearing Procedures

Secondly, petitioner States Marine contends that even if retroactive application of these procedural changes is valid under Section 15, they cannot be applied to it since it resigned from the Conference prior to their adoption and thus did not agree to be subject to these new provisions of the conference agreement.

We think that the petitioner protests too much. The record shows that when counsel for the Conference recommended new procedures in line with our *States* decision, States Marine voted for their adoption; it then withdrew its vote pending further consideration of the matter and later submitted more detailed proposals which it considered more protective of the accused's rights. It only withdrew from the Conference when negotiations between them on the charges that the Conference had brought against it broke down. And at that, States Marine's resignation came pending the outcome of an investigation instituted upon its own complaint to the Commission that the self-policing provisions of the Conference then in effect were unfair. Now it seeks to avoid prosecution under procedures which all parties agree meet the fairness standards of *States*—standards which States Marine so ardently advocated a short while ago.

But even apart from this, States Marine's protests do not survive analysis. Conferences, by the explicit terms of Section 15, are commanded to police effectively their agreements or risk having them disapproved. States Marine would have conferences enforce their charges against members who resign before new self-policing procedures can be adopted, not in the conference's self-policing forum, but in the "courts" on a breach of contract basis. This offers too easy an out, and does violence to the whole rationale behind the creation of these shipping conferences.

Too easy, because obviously a conference member line accepts as part of the conference agreement not only the self-policing provisions specifically written in, but also any applicable laws affecting such provisions as declared by any competent court duly seized of the issue. When this court in the *States* decision in 1967, a proceeding initiated by petitioner States Marine itself, declared the specific procedural requirements of the Conferences' self-policing provisions insufficient under due process standards, this court in effect told the Conference members what the fair hearing standards must be and directed the Conferences to proceed with the formalities of adoption and approval by the Commission. As the Commission held, before a valid hearing on the charges against States Marine could be had, the formal process of adopting the new procedural rules had to be complied with, the prime reason for this being so that the accused, States Marine, would have detailed chapter and verse of the procedural rules under which it was being tried. This temporary hiatus did not give States Marine grounds on which to escape the jurisdiction of the Conference established by an agreement freely entered into by States Marine, albeit an agreement subsequently modified by judicial decision (to which States Marine was a party) and Conference and Commission action implementing that judicial mandate.

To permit the stultifying effect of resignation, as urged by States Marine, would emasculate the whole shipping conference concept. The congressional theory is that their regulation is best accomplished internally. Within legislatively defined limits the conferences make the rules and they enforce the rules, hopefully more swiftly, more expertly, and just as fairly as the courts would. To permit an individual line, by exercising an option of resignation, to escape conference action and toss the entire internal disciplinary problem into the lap of the courts of some country

would negate completely the conference system's effectiveness.

### C. *Feasibility of Court Enforcement of Shipping Conference Internal Rules*

The problem with court enforcement of the Conference's charges is implicit at the outset: Enforcement in the courts of which country? And, whose rules of law and procedure will apply? At the time the alleged infractions of the conference agreement took place the Pacific Coast European Conference was composed of twenty-two different shipping lines, most of which do not appear to be American flag. The trade carried on by the Conference is international in scope, touching ports on the United States Pacific coast at one end and ports on all shores of Europe at the other. Even within a single shipping line the registrations of individual vessels operated by it need not be of the same flag, for example, when a line charters a vessel having a different national registration.

Turning specifically to the allegations that States Marine unlawfully gave rebates to shippers in violation of the Conference Agreement, we see that the port involved was Hamburg, Germany; the shipments involved belonged to Allied Canners and Packers, apparently an association of shippers; shipments over a two-year span were involved; and no less than thirteen ships were named as discharging the illegal rebate cargo.

Even in this relatively uncomplicated situation, the alternative forums in which the Conference might bring suit, and the possible challenges to whatever choice it might make, could lead to frustrating inaction. Should it sue in the United States, the country having primary jurisdiction over States Marine? Should it bring suit in Germany, the country in which the offending shipments were discharged? Should it bring suit in the countries in which the alleged rebates actually changed hands? Should it bring suit in the country of origin of each ship involved? Would the membership approve suit in any of those locations? The accused line could embroil it in an expensive and time-consuming round of preliminary litigation designed to test the wisdom of the Conference's choice of forum. We know only too well how litigants have been able to stretch out for years the preliminary stages of a lawsuit through manipulation of discovery rules and jurisdictional tests. This possibility in itself would be enough to give even the most aggressive conference cause for hesitation in pressing court suits on its charges, and likewise give the member lines tempted to violate the conference agreement cause to believe that if discovered no punishment would follow.

If suit did proceed to trial on the merits, the Conference for many reasons could quite conceivably fail to prove the charges against the accused line.[28] Conferences serving the foreign trade of the United States are by definition engaged in *international* trade. Records essential to proof of the unlawful rebating would undoubtedly be located in the offices of shippers and carriers in many different countries. Many nations have long established policies embodied in statutes against the enforcement of foreign court subpoenas. In addition, certain of these countries have made it clear that records located on their soil are not to be provided the Federal Maritime Commission for use in policing violations of the Shipping Act by individual lines.[29] Moreover, essential witnesses would likely be located all over the map and their presence at trial would be difficult and ex-

---

28. This is not to imply that something less than the procedural due process required in a court would be *un*fair to the defendant. *See* our discussion at note 11, *supra,* and in *States.*

29. We considered the effect of obedience of conference members to such statutes on the validity of conference agreements under the Shipping Act in Calcutta East Coast of India and East Pakistan/U.S.A. Conference v. FMC, 130 U.S.App.D.C. 261, 399 F.2d 994 (1968).

pensive for the Conference to secure. Lastly, if the Conference did prevail on the issues, it would prove almost impossible to show damages for the accused line's breach of contract in the absence of a liquidated damages clause in the conference agreement.

The conferences are aware of all these problems and undoubtedly would be reluctant to prosecute a former member for breaches of its conference agreement if they had to do ·so in the "courts," as States Marine suggests. Furthermore, the situation before us has the potential of becoming far from a unique instance in the history of shipping conferences in the foreign trade of the United States. At oral argument it was pointed out by counsel for the Commission that many of the approximately one hundred conferences serving our foreign trade have yet to amend their agreements to conform to the fairness principles of *States*. Violators of these agreements, we have seen, cannot be legitimately tried and punished under the existing provisions. They must be tried and punished under procedures conforming to the principles of *States*, *after* such new procedures have been approved by the Commission. If we hold that those accused members who leave the conferences prior to the adoption and approval of new self-policing provisions cannot be prosecuted in the conference's forum, but must be sued for breach of contract in some court, we essentially excuse them from answering the charges against them, no matter how legitimate the conference's claim. It is thus not hard to envision the rash of resignations from accused lines that would ensue such a decision.

As noted previously, the very existence of a conference is directly related to the extent to which its members live up to the conference agreement. A conference thus has a great stake in seeing that its agreement is effectively policed. Section 15 of the Shipping Act, as amended, demands that the agreements be effectively policed. And it would be defeating the express terms of the statute to provide a means whereby violators of the conference agreements could "beat the rap" by the mere expedient of resignation.

### IV. Conclusion

It accords fully with the intent of Congress, as determined from the legislative histories of the 1916 Shipping Act and the amendments thereto of 1961, to interpret Section 15 of the Act as not only permitting but requiring the application of new fair hearing procedures according with the principles of *States* to members who have resigned in the interval between the date of *States* and the date of approval of new fair hearing procedures by the Commission, in order to bring former members before the conference self-policing enforcement bodies to answer for violations occurring while they were members.

We find, therefore, that because the changed fair hearing procedures were compelled by judicial decree and necessarily subject to the Commission's approval prior to implementation by the Conference after States Marine's resignation, because States Marine originally contracted to have its infractions of the conference agreement disciplined within the Conference, and because Congress has considered and declared that breaches of conference agreements can be most effectively disciplined within the conferences pursuant to those agreements, the Federal Maritime Commission was correct in approving a provision in this conference agreement empowering it to proceed against States Marine and all others similarly situated under self-policing fair hearing provisions adopted and approved subsequent to States Marine's resignation.

The Federal Maritime Commission Order of 25 July 1969, on appeal in No. 23,330, is

Affirmed.

WILBUR K. MILLER, Senior Circuit Judge:

I concur in the opinion in No. 22,407 but dissent in No. 23,330 for the follow-

ing reason: The self-policing regulations were finally approved by the Federal Maritime Commission in October, 1968. States Marine Lines resigned from the Conference December 1, 1967. The simple question is whether the new self-policing regulations may lawfully be applied retroactively to States Marine. I think not.